IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-141

Filed 4 June 2024

Cumberland County, Nos. 16 CRS 53838-39

STATE OF NORTH CAROLINA

v.

JEANIE KASSANDRA DITTY, Defendant.

Appeal by the State from order entered 20 June 2022 by Judge James Floyd Ammons, Jr., in Cumberland County Superior Court and conditional appeal by Defendant from order rendered 29 November 2018 by Judge Claire Hill in Cumberland County Superior Court.  Heard in the Court of Appeals 5 September 2023.

*Attorney General Joshua H. Stein, by Assistant Attorney General Robert C. Ennis, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender John F. Carella, for defendant.*

MURPHY, Judge.

The trial court properly concluded that it had jurisdiction to hear Defendant's 18 November 2021 *Motion to Enforce Plea Agreement* because the 29 November 2018 order on Defendant's previous motion was never entered.  However, we reverse the trial court's order granting Defendant specific performance of the plea agreement for

accessory after the fact to first-degree murder because she did not change her position in detrimental reliance upon the plea agreement prior to the State's withdrawal.

## BACKGROUND

On 2 December 2015, Defendant Jeanie Kassandra Ditty's two-year-old daughter died as the result of a combination of head injuries, soft tissue injuries, and internal injuries, including a lacerated liver. On 24 March 2016, Defendant was charged with felony child abuse inflicting serious bodily injury and first-degree murder in connection with her daughter's death, and she was arrested and held on these charges without bond. Two days later, Zachary Keefer—Defendant's romantic partner at the time—was arrested on the same charges.

Defendant offered to plead guilty to felony child abuse because "she knew or should have known that she was leaving her child [in the care of Keefer,] somebody who had issues with rage[]" on the day of her daughter's death. The State declined to accept this plea offer. Defendant responded by offering to plead guilty to accessory after the fact to first-degree murder, and, in support of this offer, provided the State with a polygraph that she had independently sought out, which "came back favorably." The State asked if Defendant would be willing to submit to a new polygraph administered by a State Bureau of Investigation polygrapher, and Defendant agreed. In July 2016, Defendant submitted to the State's polygraph. The results of the State's polygraph were consistent with those of Defendant's independently-sought polygraph: Defendant "passed" all questions except the one

regarding whether she felt responsible for her daughter's death, which had inconclusive results.

During the next several months, the State requested that Defendant not move for bond reduction, push for an indictment, or request a probable cause hearing while the State continued its investigation and the parties continued their plea negotiations. The State ultimately requested that Defendant submit to a second interview by the Fayetteville Police Department or with Charlie Disponzio, the State's investigator; and Defendant voluntarily submitted to an interview with Mr. Disponzio on 16 November 2017.

On or about 7 January 2018, the State provided Defendant with a plea transcript and memorandum of agreement for accessory after the fact to first-degree murder; and, on 8 January 2018, Defendant signed and returned the documents. The State never signed the plea agreement. The agreement required, in pertinent part:

> 1. [Defendant] will enter a plea of GUILTY to [Accessory After the Fact to First-Degree Murder] . . . .
>
> 2. [Defendant] will use her best efforts to do the following:
>
>> a. Submit to interviews and debriefings with investigative agents and prosecuting attorneys for the State and the United States of America;
>>
>> b. Fully and truthfully disclose her involvement and the involvement of others in criminal activity, including her involvement in the cases in which she is charged;

c. Submit to polygraph examinations of other similar investigative tools at the request of the State and the United States of America;

d. Actively assist law enforcement by participating in law enforcement controlled conversations and meetings with co-conspirators or co-defendants;

e. Testify fully and truthfully in any proceeding, State or Federal, including but not limited to, grand jury proceedings and trials, regarding her and others' knowledge and participation in criminal activity and crimes of violence;

f. Comply with all laws of the State and the United States of America; and,

g. Waive all rights to any item seized by law enforcement in these matters and agrees that same may be disposed of as by law provided without further notice to [Defendant].

The agreement did not require Defendant "to forego requesting a bond-reduction hearing, a probable cause hearing, or an indictment." Pursuant to the plea agreement, Defendant was to provide "substantial assistance and cooperation[]" and, upon delivering such assistance, would "receive an active sentence of 44 months minimum, 65 months maximum." However, if Defendant violated the terms of the agreement, the parties would be free to argue as to sentencing, with that sentencing left to the discretion of the trial court. The agreement further provided that the State would not use "statements made by [Defendant] regarding the cases in which she is currently charged in prosecutions against her[]" unless Defendant withdrew from the plea and that the State may void the agreement "in its sole discretion[] [if it]

determines that [Defendant] has given false information or false testimony pursuant to this agreement[.]"

The State scheduled a plea hearing for 7 March 2018, though it canceled this hearing on its scheduled date. Due to a conflict, the Cumberland County District Attorney's office withdrew as counsel for the State on 28 March 2018, and Special Prosecutor Julia Hejazi took over the State's prosecution of Defendant's case. *See generally* N.C.G.S. §§ 7A-413(a)(2) and 7A-415 (2023). The State informed Special Prosecutor Hejazi that Defendant had signed the plea agreement but that the State had canceled Defendant's plea hearing and, therefore, Defendant had not yet entered a guilty plea.

In April 2018, Special Prosecutor Hejazi advised Defendant that—based on her independent review of new and existing evidence—she would extend a new plea offer of second-degree murder to both Defendant and Keefer. Defendant rejected Special Prosecutor Hejazi's new offer; and, on 11 September 2018, was indicted for felony child abuse and first-degree murder. Shortly after her indictment, Defendant filed a motion seeking to enforce and compel specific performance of the State's initial plea offer for accessory after the fact to first-degree murder. The trial court, by Judge Claire Hill, rendered an oral denial of Defendant's motion on 29 November 2018.

On the same day, the State moved, and was permitted, to join Defendant and Keefer for trial. A joint trial was scheduled for 19 August 2019 but was ultimately continued until 12 November 2019. However, in November 2019, the State dropped

its charges against Keefer. Defendant's case proceeded to trial on the charges of first-degree murder and felony child abuse on 9 March 2020. On 20 March 2020, the trial court declared a mistrial due to a hung jury, and a new trial was scheduled.

On 12 August 2020, Defendant's court-appointed counsel, Chief Public Defender Bernard P. Condlin, who had represented Defendant in all proceedings since March 2016, withdrew as counsel, and the trial court ordered that new counsel be assigned by the Capital Defender. On 11 September 2020, the Capital Defender appointed Meleaha Machelle Kimrey to represent Defendant.

Prior to the new trial date, Defendant filed a new *Motion to Enforce Plea Agreement*, seeking specific performance of the State's previous plea agreement for accessory after the fact to first-degree murder. In this motion, Defendant again argued that she relied to her detriment on the State's January 2018 plea agreement and, consequently, did not file for a new bond hearing; did not push for an indictment; submitted to the State's polygraph and interview; and—as a result of the late indictment—had less time than her co-defendant to review discovery materials.

On 22 November 2021, the trial court, by Judge James F. Ammons, Jr., heard and rendered its order granting Defendant's motion to enforce. Special Prosecutors Whitney Belich and Lisa Coltrain appeared as counsel for the State at the hearing.[1]

---

[1] The record makes no specific reference to Special Prosecutor Hejazi's withdrawal as counsel for the State. However, the record contains no documents signed by Special Prosecutor Hejazi on behalf of the State after 20 March 2020. On 17 November 2021, Defendant's trial counsel certified

As of the hearing date, Defendant had been incarcerated pending trial for 69 months, a period of time more than the maximum sentence—65 months—that she would have received pursuant to the aborted plea agreement. On 22 November 2021, Defendant was released on a combined $50,000.00 unsecured bond and directed to return to court on 2 December 2021.

At the December appearance, the parties entered into a *Consent Order* whereby the trial court, *inter alia*, stayed further proceedings until after entry of its written order. On 10 February 2022, the State moved for reconsideration of the orally-rendered order. The trial court heard arguments on the State's motion on 24 March 2022 and ultimately entered its written order granting Defendant's motion to enforce on 20 June 2022.

On 20 July 2022, the State petitioned our review of the trial court's *Order to Enforce Plea Agreement*. On 2 September 2022, Defendant filed her response and a conditional petition for review of Judge Hill's earlier order denying Defendant's motion to enforce the plea agreement. We allowed both petitions; and, on 5 September 2023, a panel consisting of (now-Chief) Judge Chris Dillon, Judge Hunter Murphy, and Judge (now-Justice) Allison Riggs heard oral arguments in this matter. On 13 September 2023, Judge Riggs assumed a new position as Associate Justice of

that she served a copy of Defendant's motion upon Special Prosecutor Lisa Coltrain; and, at the 22 November 2021 hearing on this motion, Special Prosecutors Lisa Coltrain and Whitney Belich appeared as counsel for the State.

the North Carolina Supreme Court. Following Justice Riggs's appointment, on 3 November 2023, we ordered that this case shall be decided by a panel consisting of (now-Chief) Judge Dillon, Judge Murphy, and Judge Carolyn Thompson, who was not present for oral arguments. On 13 November 2023, Defendant filed a *Motion for New Panel to Consider Oral Argument.* We denied this motion on 19 December 2023 and took judicial notice of the prior oral argument conducted and recorded on 5 September 2023.

## ANALYSIS

No judgment has been entered against Defendant. This case is before us on appeal from an interlocutory order not otherwise authorized by N.C.G.S. § 7A-27(b) or N.C.G.S. §§ 15A-1444–1445; however, this Court—by a panel consisting of Judge (now-Justice) Richard Dietz, Judge April Wood, and Judge John Tyson (dissenting)— allowed the State's *Petition for Writ of Certiorari* and Defendant's *Conditional Petition for Writ of Certiorari* by majority vote on 19 October 2022. *See* N.C. R. App. P. 21(a)(1) (2023) (empowering appellate courts to issue writ of certiorari to review orders by trial court "when no right of appeal from an interlocutory order exists"); *see generally* N.C.G.S. § 7A-27(b) (2023) (dictating cases in which appeal from trial court "lies of right directly to the Court of Appeals"), N.C.G.S. §§ 15A-1444–1445 (2023) (governing statutory bases for appeal by criminal defendant and appeal by the State, respectively).

On appeal from the trial court's *Order to Enforce Plea Agreement*, the State argues that "the trial court[,] [by Judge Ammons,] lacked authority to overrule Judge Hill's prior denial order by granting Defendant's second motion to enforce the same plea agreement, and its 22 June 2022 order therefore should be vacated." In the alternative, the State argues that the trial court erred in granting Defendant's motion to enforce the withdrawn plea agreement on the merits.

In response to the State's appeal, Defendant argues that the trial court correctly concluded that it was not bound by Judge Hill's previous ruling and that Defendant's detrimental reliance on the plea agreement necessitated its enforcement. In the alternative, if we conclude that Judge Ammons lacked authority to overrule Judge Hill's previous ruling, Defendant challenges the trial court's order denying her motion to enforce on the merits.

## A. Trial Court's Jurisdiction

As a preliminary matter, we address whether the trial court's initial ruling by Judge Hill was properly entered, such that it may support both Defendant's conditional appeal and the State's argument that the trial court, by Judge Ammons, lacked jurisdiction to reconsider Defendant's motion to enforce. *See generally State v. Woolridge*, 357 N.C. 544, 549-50 (2003) (noting the "well[-]established" principle that "ordinarily one judge may not modify, overrule, or change the judgment of another Superior Court judge previously made in the same action[]" absent "a substantial change in circumstances . . . warrant[ing] a different or new disposition

- 9 -

of the matter[]"). We review de novo whether Judge Hill's denial of Defendant's motion was entered, as an order "must be entered of record, and[,] until this shall be done, there is nothing to appeal from[,]" and no order exists to confer appellate jurisdiction. *State v. Mangum*, 270 N.C. App. 327, 331 (2020) (quoting *Logan v. Harris*, 90 N.C. 7, 7 (1884)).

During the 22 November 2021 hearing on Defendant's motion to enforce, Defendant's former trial counsel, Chief Public Defender Condlin, testified, in pertinent part, as follows:

> [THE STATE:] So Judge Hill denied this exact same motion to enforce this plea agreement that we're speaking about today?
>
> [CONDLIN] That is correct.
>
> [THE STATE:] Okay. And to your knowledge, was an order to that effect put into place?
>
> [CONDLIN:] I know she didn't ask me to draft the order.

The trial court then inquired further into Judge Hill's previous order:

> THE COURT: Anybody ever seen Judge Hill's order?
>
> [THE STATE]: Your Honor, in our file we have a drafted proposed order but it's not signed or dated . . . . [B]ut . . . we don't have any drafted -- or any signed order from Judge Hill on this motion.
>
> THE COURT: . . . . [T]he fact that there is no order that we can find probably indicates that the order was never entered.

[THE STATE]: I can't speak to that, Your Honor.  I mean that is possible.  It's also possible that a copy of the signed order never made it back to the [S]tate to go into the file but that it does exist somewhere else[,] but I can't make any representation one way or the other to that.

THE COURT: Now, I'm the first one to admit I have a hard time seeing things in the file and that's why I never say it's not in the file.  I say I can't find it.  But I've looked and I've asked the [C]lerk to look and I'm asking y'all and what you say you got is a draft unsigned.  You got one?

[TRIAL COUNSEL]: Do not, Judge.  The only thing that I had was the -- a copy of the motion that had been filed and . . . written at the top "denied" but that's all that . . . [I've seen.]

. . . .

THE COURT: All right . . . . The clerk found the original motion to enforce the plea agreement that was denied by Judge Claire Hill [on 29 November 2018,] and it's denied in her writing "denied" and the date and signing it so she may not have even asked anybody [to draft] a written order . . . .

The trial court, by Judge Ammons, found that "a proper order was never entered" by Judge Hill on Defendant's motion to enforce because "there was no written order making findings of fact or conclusions of law ever included in the file." Therefore, the trial court did not purport to review Judge Hill's prior ruling on Defendant's motion to enforce; instead, it concluded—as if reviewing Defendant's motion for the first time—"that it ha[d] jurisdiction to hear this motion . . . on the basis of detrimental reliance."

In the civil context, "a judgment is entered when it is reduced to writing, signed by the judge, and filed with the clerk of court pursuant to Rule 5 [of the North Carolina Rules of Civil Procedure]." N.C. R. Civ. P. 58 (2023). However, our Supreme Court has articulated different requirements for entry of a judgment or order in the criminal context:

> Rule 4 [of the North Carolina Rules of Appellate Procedure] treats order and judgments in criminal cases identically. *Rendering* a judgment or an order means to pronounce, state, declare, or announce the judgment or order, and is the judicial act of the court in pronouncing the sentence of the law upon the facts in controversy. *Entering* a judgment or an order is a ministerial act which consists in spreading it upon the record. For the purposes of entering notice of appeal in a criminal case under Rule 4(a), a judgment or an order is rendered when the judge decides the issue before him or her and advises the necessary individuals of the decision; a judgment or an order is entered under that Rule when the clerk of court records or files the judge's decision regarding the judgment or order.

*State v. Oates*, 366 N.C. 264, 266 (2012) (cleaned up) (emphasis in original). Our Supreme Court has further clarified "that a trial court has entered a judgment or order in a criminal case in the event that it announces its ruling in open court and the courtroom clerk makes a notation of its ruling in the minutes being kept for that session." *State v. Miller*, 368 N.C. 729, 738 (2016).

Here, Judge Hill rendered her denial of Defendant's motion to enforce by announcing, in open court, "In my discretion I'm denying the defense motion to enforce a plea agreement after considering the case law and arguments of counsel."

At some time after rendering her decision, Judge Hill signed Defendant's motion to enforce—file-stamped on 19 November 2018—next to a notation of "Denied 11-29-18[.]" After extensive discussion amongst the parties and the trial court, the Clerk of Court located this motion; however, no marking or file stamp by the Clerk on the notated motion, nor any other entry in the record before us, indicates Judge Hill's order was "spread[] [] upon the record" by the Clerk of Court through the ministerial act of filing or recording. *Oates*, 366 N.C. at 266; *see also McKinney v. Duncan*, 256 N.C. App. 717, 721 (2017) (holding that the "record fail[ed] to establish that the orders were entered" because they "[did] not bear a file stamp or other indication that they were ever filed with the clerk of court").

We conclude that Judge Hill's order denying Defendant's motion to enforce was never entered; and, therefore, the trial court, by Judge Ammons, was free to consider Defendant's motion to enforce. While "a trial court's ruling must be upheld if it is correct upon any theory of law, and thus it should not be set aside merely because the court gives a wrong or insufficient reason for it[,]" we note that, in reaching the same conclusion, the trial court relied on a misapprehension of law. *Bracey v. Murdock*, 286 N.C. App. 191, 195 (2022), *disc. rev. denied*, __ N.C. __ (2023) (citations and marks omitted). As discussed above, an order or judgment in a criminal case is entered when the clerk of court records or files the judge's decision, and Judge Hill's order need not have been reduced to writing with findings of fact and conclusions of law to be properly entered.

## B.  Defendant's Motion to Enforce

Next, we consider the State's argument on the merits that the trial court erred in granting Defendant's motion to enforce the plea agreement.  The State contends that the trial court erred by concluding (1) that Defendant had a federal due process right to enforcement of the aborted plea agreement, despite never having pled guilty pursuant to that agreement, and (2) that Defendant detrimentally relied on—and was therefore prejudiced by—the plea agreement.

### 1. Enforceability of Plea Agreement without Guilty Plea

The State first challenges the trial court's conclusion that Defendant had a federal due process right to enforcement of the aborted plea agreement, despite never having pled guilty pursuant to that agreement.  In support of its argument, the State cites the United States Supreme Court's holding in *Mabry v. Johnson* that

> [a] plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest.  It is the ensuing guilty plea that implicates the Constitution.

*Mabry v. Johnson*, 467 U.S. 504, 507-08 (1984).  The undisputed facts indicate that Defendant never entered—and the trial court never approved or accepted—a guilty plea pursuant to the plea agreement.  Thus, the State argues under *Mabry* that Defendant was not "deprive[d] . . . of liberty or any other constitutionally protected interest" absent "judgment of a court[.]"  *Id.* at 507.

However, our Supreme Court has interpreted the United States Supreme Court's holdings in *Santobello v. New York* and its progeny as providing that, even when a defendant does "not enter a guilty plea pursuant to the purported [plea] agreement," she may still demonstrate that "[her] federal due process rights were violated" if "the facts reveal that [the] defendant relied to [her] detriment on the [aborted plea] agreement." *State v. Hudson*, 331 N.C. 122, 148 (1992), *cert. denied, Hudson v. North Carolina*, 506 U.S. 1055 (1993) (citing *State v. Collins*, 300 N.C. 142 (1980)); *see Santobello v. New York*, 404 U.S. 257, 262 (1971) ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.").

Here, the trial court found that Defendant took several actions in detrimental reliance upon the aborted plea agreement, including "debriefing the State through Mr. Disponzio," "[n]ot requesting a bond hearing[,]" "remaining in custody since the day of her arrest for a total of 69 months as of . . . [22 November] 2021[,]" "[n]ot asking for a probable cause hearing, nor pushing for an indictment[,]" and "chang[ing] [her] strategy from trial preparation to preparing to testify against [Keefer]." The trial court then concluded that, under Defendant's right to due process, the State was bound by its agreement to accessory after the fact to first-degree murder when Defendant "detrimentally relied through her attorney on the plea bargain that was offered by the State of North Carolina[,]" and Defendant was therefore entitled to

enforcement of that agreement. In reaching these conclusions, the trial court cited our decision in *State v. Sturgill*, 121 N.C. App. 629 (1996).

In *Sturgill*, we held that the defendant, who detrimentally relied on a law enforcement officer's promise that the State would not charge him as a habitual felon if he provided incriminating statements, was entitled under "notions of substantial justice and fair play, as well as [the] defendant's substantive due process rights," to a new trial and suppression of his confession, even though the law enforcement officer never had authority to make such a promise. *Id.* at 631. When analyzing the facts in *Sturgill*, we noted that

> [o]ur Supreme Court addressed a *somewhat similar* issue in *State v. Collins*. In *Collins*, the defendant moved to dismiss . . . charges because the State failed to honor a plea arrangement reached between the defendant's attorney, a police officer, and an assistant district attorney. The negotiations resulted in a written plea agreement . . . .
>
> Later the same day, at a probable cause hearing on the felony charges, a different assistant district attorney refused to honor the existing plea agreement, based on his opinion that the plea bargain was inappropriate, and he had not been consulted.

*Id.* at 633 (emphasis added) (citation omitted).

Ultimately, we held in *Sturgill* that

> [t]he principles set forth in *Collins* and its progeny are equally applicable to the instant case. However, we note two distinguishing factors: (1) the promise made to [the] defendant was not in the context of plea negotiations, but rather was made during police interrogation; and (2) a police detective, rather than the prosecutor, made the so-

called "nonprosecution agreement" with [the] defendant . . . .

*Id.* at 635. We then characterized "[t]he *Collins* decision [as] an affirmation that, when a defendant 'takes action constituting detrimental reliance upon an agreement,' the Constitution requires courts to '[ensure] the defendant what is reasonably due in the circumstances.'" *Id.* (quoting *Collins*, 300 N.C. at 145) (cleaned up). We further reasoned that

> [t]he change of position contemplated in *Collins* is a defendant's detrimental reliance on a governmental promise, which results in a derogation of his constitutional rights. Such agreements may not be avoided to the prejudice of defendants as those "defendants have a constitutional right to be treated with 'fairness' throughout the [prosecutorial] process."

*Id.* at 639 (quoting *Collins*, 300 N.C. at 148).

Although our discussion and application of the principles in *Collins* were relevant to our reasoning in *Sturgill*, they did not serve to expand or modify our Supreme Court's holding in *Collins*, nor do they have any precedential value in the context of enforcing plea agreements without judicial approval. The trial court improperly relied on *Sturgill* to support its conclusion that the State violated Defendant's constitutional right to due process. However, if we conclude that the trial court nevertheless reached the correct result under the applicable law of *Collins* and its progeny, we must uphold the trial court's ruling. *See Bracey*, 286 N.C. App. at 195.

In *Collins*, our Supreme Court interpreted the *Santobello* court's holding that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello*, 404 U.S. at 262. The *Collins* court noted it addressed "a case of first impression[,]" as—unlike in *Santobello*, where the defendant had already entered, and the trial court had accepted, a guilty plea—the defendant in *Collins* had never actually pled guilty. *Collins*, 300 N.C. at 145 ("[The] [d]efendant contends that he was deprived of . . . his fourteenth amendment right to due process of law by the judge's refusal to enforce the plea arrangement between [the] defendant and Assistant District Attorney Cole."). In *Collins*, as in this case, the State withdrew from the plea agreement before the defendant had fulfilled the obligation of pleading guilty.

In its interpretation of *Santobello*, the *Collins* court rejected the holding of the Fourth Circuit in *Cooper v. United States* that "under appropriate circumstances . . . a constitutional right to enforcement of plea proposals may arise before any technical 'contract' has been formed, and on the basis alone of expectations reasonably formed in reliance upon the honor of the government in making and abiding by its proposals." *Id.* at 147 (quoting *Cooper v. United States*, 594 F.2d 12 (4th Cir. 1979)). Our Supreme Court instead held, in pertinent part,

> that there is no absolute right to have a guilty plea accepted. The State may withdraw from a plea bargain arrangement at any time prior to, but not after, the actual

entry of the guilty plea by [the] defendant or any other change of position by him constituting detrimental reliance upon the arrangement. The rationale behind these decisions is that plea bargain arrangements

> are not binding upon the prosecutor, in the absence of prejudice to a defendant resulting from reliance thereon, until they receive judicial sanction, anymore than they are binding upon defendants (who are always free to withdraw from plea agreements prior to entry of their guilty plea regardless of any prejudice to the prosecution that may result from a breach).

When viewed in light of the analogous law of contracts, it is clear that plea agreements normally arise in the form of unilateral contracts. The consideration given for the prosecutor's promise is not [the] defendant's corresponding promise to plead guilty, but rather is [the] defendant's actual performance by so pleading. Thus, the prosecutor agrees to perform if and when [the] defendant performs but has no right to compel [the] defendant's performance. Similarly, the prosecutor may rescind his offer of a proposed plea arrangement before [the] defendant consummates the contract by pleading guilty or takes other action constituting detrimental reliance upon the agreement.

In the instant case, [the] defendant had neither entered a guilty plea nor in any way relied on the plea agreement to his detriment. After the rescission of the agreement, the State's motion for a continuance was granted and [the] defendant was thereafter afforded a fair trial. [The] [d]efendant has not been prejudiced by the disavowal of his plea arrangement, and we find no violation of his constitutional rights.

*Id.* at 148-49 (citations and marks omitted).

Our Supreme Court's holding in *Collins* established that the State has an absolute right to withdraw from a plea agreement unless and until, "but not after, the actual entry of the guilty plea by [the] defendant or any other change of position by [her] constituting detrimental reliance upon the arrangement." *Id.* at 148. Though the State may not withdraw to the prejudice of the defendant, its right to withdraw remains equal in force to that of the defendant's right "to withdraw from plea agreements prior to entry of their guilty plea regardless of any prejudice to the prosecution that may result from a breach." *Id.* at 149. The State may be bound to an offer which has not resulted in the actual entry and acceptance of the defendant's guilty plea *only* when the defendant is necessarily prejudiced by changing her position in detrimental reliance upon that agreement prior to judicial sanction or the State's withdrawal.

Under *Collins*, we treat the aborted plea agreement as a unilateral contract between the parties, where the consideration given in exchange for the State's promises outlined in the agreement is Defendant's performance of the terms of that agreement, including the entry of a guilty plea. *Id.* ("The consideration given for the prosecutor's promise is not [the] defendant's corresponding promise to plead guilty, but rather is [the] defendant's actual performance by so pleading."). In contract law, a party may be bound by its promise in absence of consideration under the doctrine of equitable estoppel:

> The essentials of equitable estoppel or estoppel *in pais* are a representation, either by words or conduct, made to another, who reasonably believing the representation to be true, relies upon it, with the result that he changes his position to his detriment. It is essential that the party estopped shall have made a representation by words or acts and that someone shall have acted on the faith of this representation in such a way that he cannot without damage withdraw from the transaction.

*Wiggs v. Peedin*, 194 N.C. App. 481, 488 (2008) (quoting *Volkman v. DP Associates*, 48 N.C. App. 155, 158 (1980)). Similarly, in the absence of Defendant's actual entry of a guilty plea in exchange for the State's promise, the State may still be bound to that promise by Defendant's detrimental reliance.

**2. Defendant's Detrimental Reliance**

In the instant case, the trial court concluded that, even though Defendant never entered a guilty plea, she had changed her position in detrimental reliance upon the State's plea offer before it was withdrawn. *See State v. King*, 218 N.C. App. 384, 388 (2012) (marks omitted) ("Once [a] defendant begins performance of the contract by pleading guilty or takes other action constituting detrimental reliance upon the agreement[,] the prosecutor can no longer rescind his offer."). The State challenges this conclusion, arguing that it withdrew the plea agreement prior to "any . . . change of position by [Defendant] constituting detrimental reliance upon the arrangement." *Collins*, 300 N.C. at 148.

The trial court found that

Defendant detrimentally relied on the State's plea offer in the following ways:

> a. Debriefing the State through Mr. Disponzio, in which she gave incriminating statements related to a crime with which she has not been charged.
>
> b. Not requesting a bond hearing.
>
> c. Remaining in custody since the day of her arrest for a total of 69 months as of the date of the hearing on [22 November] 2021.
>
> d. Not asking for a probable cause hearing, nor pushing for an indictment, thereby not receiving discovery in the same manner and the same time frame as her co-defendant, Zachary Keefer, who was indicted approximately 9 months before the Defendant.
>
> e. The defense team changed their strategy from trial preparation to preparing to testify against Mr. Keefer.

Whether Defendant debriefed the State in her interview with Mr. Disponzio; abstained from requesting a bond hearing, pushing for an indictment, or asking for a probable cause hearing; remained in custody for 69 months as of the hearing date; and changed her trial strategy are findings of fact. As in other motions implicating a defendant's due process rights, such as motions to suppress, our review of these findings of fact is limited to determining whether they are supported by competent evidence. *See, e.g., State v. Parisi*, 372 N.C. 639, 649 (2019) (cleaned up) ("As we have stated on many occasions, this Court reviews a trial court's order granting or denying a defendant's suppression motion by determining whether the trial court's underlying

findings of fact are supported by competent evidence and whether those factual findings in turn support the trial court's ultimate conclusions of law."). However, whether Defendant took these actions in *detrimental reliance* upon—and was therefore prejudiced by—the withdrawn plea agreement is an issue of law which we review de novo. *See Hudson*, 331 N.C. at 148 (emphasis added) ("Because defendant did not enter a guilty plea pursuant to the purported agreement, whether defendant's federal due process rights were violated turns on whether the facts reveal that defendant relied to his detriment on the agreement. We agree with the trial court's *conclusion* that no such reliance is evident."); *see also Parisi*, 372 N.C. at 655 (cleaned up) (italics omitted) ("Although the issue of whether an officer had probable cause to support a defendant's arrest for impaired driving exists certainly contains a factual component, the proper resolution of that issue inherently requires the exercise of judgment or the application of legal principles, and constitutes a conclusion of law subject to de novo review rather than a finding of fact . . . .").

As the trial court found, "[t]he terms of the Memorandum of Agreement . . . did *not* require [] Defendant to forego requesting a bond-reduction hearing, a probable cause hearing, or an indictment." As a matter of law, any such forbearance by Defendant was not induced by—and could therefore not be in reliance upon—the State's plea agreement. Furthermore, although plea negotiations began in early 2016, the State did not present Defendant with any plea offer until 7 January 2018. The trial court found that Defendant submitted to the "debriefing/interview" with Mr.

Disponzio on 16 November 2017.  Defendant could not  "detrimentally [rely] on the State's plea offer" in making any statements during this interview, as it occurred nearly two months before she received any offer from the State.  *See State v. Tyson*, 189 N.C. App. 408, 416 (2008) ("While the government must be held to the promises it made, it will not be bound to those it did not make.").  Similarly, the trial court found that "by roughly sixty days into the charges being filed, [the State] was leaning towards [Keefer] being the principal[;] and, therefore, that is the direction that [trial counsel], the Defendant, and the defense team's focus went in everything they did." This finding reflects that Defendant changed her focus from trial preparation to preparing to testify against Keefer roughly sixty days after 24 March 2016—around or about 20 months before the State's presentation of the plea agreement to Defendant.

The trial court found that the State scheduled Defendant's case for plea "[d]uring the January 2018 Administrative week," and, "[a]t the time the plea was scheduled, following the signing of the plea transcript and [m]emorandum of [a]greement, Defendant had completed all conditions of the plea, except for testifying in [Keefer's] trial."  The trial court made no finding—nor does Defendant raise any argument alleging—that Defendant took any action in detrimental reliance upon the agreement during the sixty-day period between its presentation on 7 January 2018 and the cancellation of the plea hearing on 7 March 2018, except for "continu[ing] to comply with the State's requests that she not seek a probable cause hearing,

indictment, or bond hearing[,]" which were not part of nor induced by the plea agreement. Accordingly, the trial court's findings of fact do not support its conclusion that Defendant changed her position in detrimental reliance upon the State's plea agreement.

We return to our Supreme Court's holding in *Collins* that "there is no absolute right to have a guilty plea accepted. The State may withdraw from a plea bargain arrangement at any time prior to, but not after, the actual entry of the guilty plea by [the] defendant or any other change of position by [her] constituting detrimental reliance upon the arrangement." *Collins*, 300 N.C. at 148. The State was free to withdraw from the agreement, as Defendant did not change her position in detrimental reliance upon it. The trial court erred in concluding that Defendant was entitled to enforcement and specific performance of the State's initial plea agreement for accessory after the fact to first-degree murder.

## CONCLUSION

The trial court, by Judge Ammons, had jurisdiction to enter the 20 June 2022 order, and we dismiss the arguments in Defendant's conditional appeal as moot. The record does not reveal any change of position by Defendant in detrimental reliance upon the plea agreement, and the State remained free to withdraw the agreement.

We reverse the trial court's order granting Defendant's motion to enforce the State's plea agreement and remand this case to the trial court for further proceedings.[2]

DISMISSED IN PART; REVERSED IN PART.

Chief Judge DILLON and Judge THOMPSON concur.

---

[2] We note that the State did not seek review of Judge Ammons's 22 November 2021 *Temporary Commitment Order*, and the same is not disturbed by this opinion.